# IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF VIRGINIA
### Richmond Division

JAMES BOWMAN,          )
                                )

      Plaintiff,         )
                                )

v.                        )          Civil Action No. 3:08CV449-HEH
                                )

GENE JOHNSON, *et al.*,    )
                                )

      Defendants.     )

## MEMORANDUM OPINION
### (Granting Motion For Summary Judgment Filed By Defendants Henceroth, Manickavasagar, and Connor )

Plaintiff, a former Virginia inmate, brings this 42 U.S.C. § 1983 action. Plaintiff has a history of hip problems which he contends were not adequately accommodated by prison officials. The matter is before the Court on the motion for summary judgment filed by William D. Henceroth, II, S. Manickavasagar, and Rosanne Connor (collectively "Defendants").[1] Plaintiff has responded to Defendants' motion for summary judgment and the matter is ripe for disposition.

## I. Summary of the Pertinent Claims

Plaintiff claims the following violations of his rights under the Eighth

---

[1] At all relevant times, Defendants worked at Deerfield Correctional Center ("DCC"). Henceroth is a board certified orthopaedic surgeon. Manickavasagar is a physician. Connor is a registered nurse. Plaintiff also named a number of other individuals as defendants who did not work at DCC. The dispositive motions by those defendants will be addressed in a separate memorandum opinion and order.

Amendment[2] against Defendants:

Claim 6　　After Plaintiff's second hip surgery, Plaintiff was discharged to DCC and the care of Dr. Henceroth:

(a)　　Defendant Henceroth failed to provide Plaintiff with adequate pain medication;

(b)　　Defendant Henceroth failed to provide Plaintiff with adequate information about Plaintiff's second hip surgery, which prevented Plaintiff from making an informed choice about his health care;

(c)　　Defendant Henceroth refused to provide Plaintiff with the physical therapy that had been ordered by Plaintiff's surgeon;

(d)　　Defendant Henceroth prematurely discontinued the provision of assistance to Plaintiff with respect to his daily living activities.[3]

Claim 7　　Defendant Connor prevented Plaintiff from receiving assistance from Nursing Assistant Lewis.

Claim 8　　Defendant Manickavasagar failed:

(a)　　to provide Plaintiff with adequate pain medication; and,

(b)　　to provide a follow-up check to see if Plaintiff had an infection.

## II. Standard for Summary Judgment

Summary judgment must be rendered "if the pleadings, the discovery and

---

[2] "Excessive bail shall not be required, nor excessive fines imposed, nor cruel and unusual punishments inflicted." U.S. Const. amend. VIII.

[3] Plaintiff also vaguely suggests that Dr. Henceroth violated Plaintiff's rights under the Fourteenth Amendment. Apparently, Plaintiff contends that Dr. Henceroth violated his substantive due process rights. "[I]t is now well established that the Eighth Amendment 'serves as the primary source of substantive protection to convicted prisoners,' and the Due Process Clause affords a prisoner no greater *substantive* protection 'than does the Cruel and Unusual Punishments Clause.'" *Williams v. Benjamin*, 77 F.3d 756, 768 (4th Cir. 1996) (quoting *Whitley v. Albers*, 475 U.S. 312, 327 (1986)). Thus, Plaintiff's substantive due process claims are subsumed within his Eighth Amendment claims.

disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). It is the responsibility of the party seeking summary judgment to inform the court of the basis for the motion, and to identify the parts of the record which demonstrate the absence of a genuine issue of material fact. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 323, 106 S. Ct. 2548, 2553 (1986). "[W]here the nonmoving party will bear the burden of proof at trial on a dispositive issue, a summary judgment motion may properly be made in reliance solely on the pleadings, depositions, answers to interrogatories, and admissions on file." *Id.* at 324, 106 S. Ct. at 2553 (internal quotation marks omitted). When the motion is properly supported, the nonmoving party must go beyond the pleadings and, by citing affidavits or "'depositions, answers to interrogatories, and admissions on file,' designate 'specific facts showing that there is a genuine issue for trial.'" *Id.* (quoting former Fed. R. Civ. P. 56(c) and 56(e) (1986)). In reviewing a summary judgment motion, the court "must draw all justifiable inferences in favor of the nonmoving party." *United States v. Carolina Transformer Co.*, 978 F.2d 832, 835 (4th Cir. 1992) (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255, 106 S. Ct. 2505, 2513 (1986)). Nevertheless, the nonmoving party cannot "'create a genuine issue of material fact through mere speculation or the building of one inference upon another.'" *Emmett v. Johnson*, 532 F.3d 291, 297 (4th Cir. 2008) (quoting *Beale v. Hardy*, 769 F.2d 213, 214 (4th Cir.1985)). Furthermore,"'Rule 56 does not impose upon the district court a

duty to sift through the record in search of evidence to support a party's opposition to summary judgment.'" *Forsyth v. Barr*, 19 F.3d 1527, 1537 (5th Cir. 1994) (quoting *Skotak v. Tenneco Resins, Inc.*, 953 F.2d 909, 915 & n.7 (5th Cir. 1992)).

In support of their motion for summary judgment, Defendants have submitted affidavits and copies of Plaintiff's medical records. Plaintiff has responded by submitting his own sworn declaration, and copies of correspondence and medical records. Plaintiff also submitted a brief in opposition to the motion for summary judgment. In the certificate of service attached to that document, Plaintiff states, "I affirm that all [of] the information provided to the Court by me is true and correct to the best of my knowledge under the penalty of perjury."[4] (Pl.'s Br. Opp'n Defs' Summ. J. Mot. ("Pl.'s Opp'n") Certificate of Service.) The foregoing remark does not transform any of the statements in Plaintiff's submissions into a sworn declaration. The Court previously informed Plaintiff "that it will not consider as evidence in opposition to any motion for summary judgment a memorandum of law and facts that is sworn to under penalty of perjury. Rather, any verified allegations must be set forth in a separate document." (May 22, 2009 Mem. Order 2.)

Furthermore, the facts offered by affidavit must be in the form of admissible evidence. *See* Fed. R. Civ. 56(e). In this regard, the statement in the affidavit or sworn statement "must be made on personal knowledge . . . and show that the affiant is

---

[4] The Court has corrected the capitalization in the quotations of Plaintiff's submissions.

competent to testify on the matters stated." Fed. R. Civ. P. 56(e)(1). Summary judgment affidavits must also "set out specific facts." Fed. R. Civ. P. 56(e)(2). Therefore, "summary judgment affidavits cannot be conclusory or based upon hearsay." *Evans v. Techs. Applications & Serv. Co.*, 80 F.3d 954, 962 (4th Cir. 1996) (citing *Rohrbough v. Wyeth Labs., Inc.*, 916 F.2d 970, 975 (4th Cir. 1990); *see also Md. Highways Contractors Ass'n v. Maryland*, 933 F.2d 1246, 1252 (4th Cir. 1991)).

In his declaration, Plaintiff makes a number of statements that are of no value in assessing the propriety of summary judgment. Some of Plaintiff's statements are either conclusory or do not set forth specific facts such as: Dr. Henceroth "treated me with hostility" (Pl.'s Decl. Opp'n Defs.' Summ. J. ("Pl.'s Decl.") ¶ 7), and on May 6, 2008, Dr. Manickavasagar "continued a course of treatment - on me - that he knew was ineffective. This caused me unnecessary and wanton pain without medical justification" (Pl.'s Decl. ¶ 11). Similarly, although Plaintiff may testify as to certain underlying facts that may have alerted Defendants to the propriety of a particular course of treatment, he is not competent simply to testify that Defendants "knew" a particular treatment "was ineffective." (Pl.'s Decl. ¶ 6.) In light of the foregoing principles and submissions, the following facts are established for purposes of the motion for summary judgment.

### III. Summary of Pertinent Facts

Plaintiff arrived at DCC at the end of November of 2007. Prior to arrival at DCC, Plaintiff had undergone surgery for a left-hip replacement and had received treatment at

Fauquier Hospital and Southampton Memorial Hospital. (Defs.' Mem. Supp. Mot. Summ. J. Henceroth Aff. ("Henceroth Aff.") ¶ 4.) Plaintiff's discharge summary from Fauquier Hospital recommends that Plaintiff have physical therapy three times a week.[5] (Pl.'s Opp'n Ex. 33, at 1.) While he was in the hospital, Plaintiff received physical therapy instruction which included exercises that Plaintiff could perform on his own. (Henceroth Aff. ¶ 5.) Plaintiff also received instructions regarding precautions he should take because of the recent surgery. (Henceroth Aff. ¶ 5.)

## A.    Plaintiff's Initial Arrival at DCC and Care by Dr. Henceroth

After Plaintiff arrived at DCC, Dr. Henceroth examined and observed him. (Henceroth Aff. ¶ 5.) In Dr. Henceroth's medical judgment, Plaintiff did not require physical therapy under the direct supervision of a therapist, but was able to ambulate and do the exercises he had been shown with precautions. (Henceroth Aff. ¶ 5.) Additionally, in Dr. Henceroth's judgment it would have been more hazardous for Plaintiff to go back and forth to the hospital for therapy than to do it on his own at DCC. (Henceroth Aff. ¶ 5.)

On December 5, 2007, Dr. Henceroth examined Plaintiff. (Henceroth Aff. ¶ 7.) Plaintiff's dressing was changed and his staples removed. (Henceroth Aff. ¶ 7.) Dr. Henceroth noted that Plaintiff's wound was draining where the three scars converge.

---

[5] Plaintiff's prison medical file from October of 2007 also indicated that Plaintiff should be transferred to an institution where Plaintiff could obtain physical therapy. (Pl.'s Opp'n Ex. 166.)

(Henceroth Aff. ¶ 7.) Dr. Henceroth ordered that a culture be taken. (Henceroth Aff. ¶ 7.) Dr. Henceroth further ordered that Plaintiff's wound be flushed with peroxide and saline and redressed daily. (Henceroth Aff. ¶ 7.)

Dr. Henceroth next saw Plaintiff on December 12, 2007. (Henceroth Aff. ¶ 8.) Dr. Henceroth noted that Plaintiff's dressing was dry with no significant drainage; a culture showed mixed skin flora. (Henceroth Aff. ¶ 8.) Dr. Henceroth discharged Plaintiff from the medical ward to assisted living. (Henceroth Aff. ¶ 8.) At this time, Plaintiff informed Dr. Henceroth that the Tylenol 500 he had been receiving, "was not working on reducing [Plaintiff's] severe pain. (Pl.'s Decl. ¶ 4.) Dr. Henceroth switched Plaintiff to Naprosyn.[6] (Pl.'s Opp'n Ex. 8.)

## B. Dr. Henceroth's Care for Plaintiff Between January and March of 2008

Dr. Henceroth next saw Plaintiff on January 2, 2008. (Henceroth Aff. ¶ 9.) Plaintiff requested physical therapy and a change in his pain medication. (Henceroth Aff. ¶ 9.) Dr. Henceroth noted that Plaintiff's wound was still healing. (Henceroth Aff. ¶ 9.) Dr. Henceroth recommended that Plaintiff "continue ambulating to increase strength and endurance; that he should not do any exercises or [use exercise] machines yet and should continue with hip precautions for four and one-half months." (Henceroth Aff. ¶ 9.) Dr. Henceroth further ordered that wound care continue daily; that Plaintiff be provided a

---

[6] Plaintiff alleges that despite Dr. Henceroth's orders, he never received Naprosyn. (Compl. Claim 6, at 2.)

cane to use when walking due to right hip pain; and that he receive Percogesic.[7]
(Henceroth Aff. ¶ 9.) Additionally, Dr. Henceroth requested an x-ray for both of
Plaintiff's hips. (Henceroth Aff. ¶ 9.)

On January 22, 2008, the DCC medical department received a request form from
Plaintiff wherein he stated that Percogesic was not adequately controlling his pain. (Pl.'s
Opp'n Ex.13.) On February 6, 2008, Dr. Henceroth switched Plaintiff's medication back
to Tylenol 500. (Pl.'s Decl. ¶ 6.)

Dr. Henceroth next saw Plaintiff on February 13, 2008. (Henceroth Aff. ¶ 10.)
Plaintiff was receiving Bactrim and Cipro. (Henceroth Aff. ¶ 10.) Dr. Henceroth noted
that Plaintiff "was able to walk 5 laps around." (Henceroth Aff. ¶ 10.) Dr. Henceroth
evaluated Plaintiff's wound and reviewed his X-rays from January 17, 2008. (Henceroth
Aff. ¶ 10.) Dr. Henceroth further instituted the following plan: debride Plaintiff's wound
superficially, take a culture, continue local wound care, dispense a cane, return to the
clinic in a month, and refer to sick call for pain medication. (Henceroth Aff. ¶ 10.)
Plaintiff was angry and told Dr. Henceroth that he would see him in Court. (Henceroth
Aff. ¶ 10.)

Dr. Henceroth next saw the Plaintiff on March 28, 2008. (Henceroth Aff. ¶ 11.)
Plaintiff wanted to know when he could move enough to wash his left foot due to his hip
precautions. (Henceroth Aff. ¶ 11.) Dr. Henceroth advised Plaintiff not to wash his left

---

[7] Percogesic is a pain medication containing a combination of acetaminophen and phenyltoloxamine. (Henceroth Aff. 3 n.1.)

foot himself. (Henceroth Aff. ¶ 11.) Plaintiff complained of pain in his right hip. (Henceroth Aff. ¶ 11.) Dr. Henceroth advised Plaintiff that he needed to wait until his left incision heals before considering surgery on his right hip. (Henceroth Aff. ¶ 11.) Plaintiff's wound was closing slowly and he was referred to sick call for pain medication. (Henceroth Aff. ¶ 11.)

### C. Plaintiff's Disagreement with Nurse Connor

Plaintiff contends that, on April 7, 2008, Nurse Connor instructed Ms. Lewis, a nursing assistant, to no longer assist Plaintiff with his daily living needs, despite the fact that Plaintiff was still housed in the assisted living pod at DCC. (Pl.'s Decl. ¶ 9.) Thereafter, "Ms. Lewis den[ie]d [Plaintiff] all forms of assistance with . . . medical treatment."[8] (Pl.'s Decl. ¶ 9.) On April 7, 2008, Plaintiff filed an informal complaint, wherein he complained that Ms. Lewis had refused him assistance per Nurse Connor's orders. (Pl.'s Opp'n Ex. CON.) Nurse Connor informed Plaintiff verbally that the issue had been addressed with him and that Ms. Lewis was aware of the Dr. Henceroth's orders and had never refused to help him. (Defs.' Mem. Supp. Mot. Summ. J. Connor Aff. ¶ 6.)

### D. Dr. Henceroth's Care for Plaintiff Between May and August of 2008

Dr. Henceroth next saw Plaintiff on May 16, 2008. (Henceroth Aff. ¶ 13.) Plaintiff requested surgery for his right hip. (Henceroth Aff. ¶ 13.) An X-ray of the right

---

[8] Defendants contend that Plaintiff's assertion that Nurse Connor instructed Ms. Lewis not to assist Plaintiff is based upon inadmissible hearsay. (Defs.' Mem. Supp. Mot. Summ. J. 13.) Plaintiff's submissions, however, reflect otherwise. (Pl.'s Opp'n Ex. 5.)

hip revealed avascular necrosis with degenerative changes.[9] (Henceroth Aff. ¶ 13.) Dr. Henceroth determined that Plaintiff no longer required assisted living as he no longer needed a trapeze bar and was able to use a regular bed on the "higher side." (Henceroth Aff. ¶ 13.) Plaintiff also was able to sit in the wheelchair without multiple pillows. (Henceroth Aff. ¶ 13.) Therefore, in Dr. Henceforth's medical judgment, Plaintiff could relax his hip precautions, but should not do anything extreme. (Henceroth Aff. ¶ 13.) According to Plaintiff, Dr. Henceforth made the determination that Plaintiff no longer required assisted living, without conducting a full physical examination of Plaintiff and over Plaintiff's objections. (Pl.'s Decl. ¶ 8.) Furthermore, Plaintiff showed Dr. Henceroth that he could not reach his feet to wash or dry them or put on socks and shoes without assistance. (Pl.'s Decl. ¶ 8.)

In July and August of 2008, Dr. Henceroth saw Plaintiff and answered his questions regarding a right hip replacement. (Henceroth Aff. ¶ 13.)

### E.   Dr. Manickavasagar's Care for Plaintiff

On April 7, 2008, Dr. Manickavasagar saw Plaintiff in the infirmary for the purpose of discussing pain medication options. (Defs.' Mem. Supp. Mot. Summ. J. Manickavasagar Aff. ("Manickavasagar Aff.") ¶ 4.) Manickavasagar noted that Plaintiff was extremely obese. (Manickavasagar Aff. ¶ 4.) Plaintiff did not complain to Dr. Manickavasagar about wound care issues or bumps on April 7, 2008. (Manickavasagar

---

[9] Dr. Henceroth represents that the plan was to replace Plaintiff's right hip, if Dr. Henceroth could obtain approval for the surgery. (Henceroth Aff. ¶ 13.)

Aff. ¶ 5.) There is no reference to these complaints in the medical records.

(Manickavasagar Aff. ¶ 5.) Manickavasagar would have noted this in the chart if Plaintiff

had complained of it. (Manickavasagar Aff. ¶ 5.) Dr. Manickavasagar observed that Dr.

Henceforth, Plaintiff's orthopaedic surgeon, was following Plaintiff's wound care.[10]

(Manickavasagar Aff. ¶ 5.)

Plaintiff complained of right hip pain. (Manickavasagar Aff. ¶ 4.) Dr.

Manickavasagar noted that Plaintiff had a history of degenerative changes which cause

pain. (Manickavasagar Aff. ¶ 4.) Dr. Manickavasagar reviewed Plaintiff's X-rays.

(Manickavasagar Aff. ¶ 4.) Dr. Manickavasagar noted that Plaintiff had a reasonable

range of motion and was able to walk fairly well. (Manickavasagar Aff. ¶ 4.) Dr.

Manickavasagar prescribed Ultram and Voltaren for Plaintiff.[11] (Manickavasagar Aff.

¶ 4.) These medications were subsequently discontinued.[12]

---

[10] Plaintiff swears Dr. Manickavasagar "denied me all form of medical treatment concerning night sweats, draining boils, yellow/green pus. Some of boils had been draining for days and I was in non[-]stop pain. Dr. [Manickavasagar] refuse to even look at the boils." (Pl.'s Decl. ¶ 10.) Plaintiff, however, has not provided any evidence that he alerted Dr. Manickavasagar to his nights sweats and boils, or that Dr. Manickavasagar was otherwise aware of these ailments.

[11] "Ultram is a narcotic-like pain reliever used to treat moderate to severe chronic pain." (Manickavasagar Aff. 2 n.1.) "Voltaren is a non-steroidal anti-inflammatory drug used to treat pain." (Manickavasagar Aff. 2 n.2.)

[12] On April 18, 2008, the Voltaren was discontinued because Plaintiff had refused to take it. (Manickavasagar Aff. ¶ 4.) Also, on April 18, 2008, Plaintiff complained of side effects from the Ultram, including shortness of breath. (Manickavasagar Aff. ¶ 4.) On May 14, 2008, Plaintiff was started on Tylenol 500 mg after he complained of being hit in the stomach. (Manickavasagar Aff. ¶ 4.)

On May 9, 2008, Plaintiff requested that Dr. Manickavasagar take a culture of Plaintiff's hip wound. (Manickavasagar Aff. ¶ 6.) The wound had healed completely. (Manickavasagar Aff. ¶ 6.) Plaintiff asked, "'How do you know there is no infection in my body? I want a blood culture. I will see you in court if you do not perform a blood culture.'" (Manickavasagar Aff. ¶ 6.) There is no indication that a culture was taken at that time.

Plaintiff did not complain of painful bumps until May 27, 2008, when he complained to the nursing staff, who evaluated and treated him. (Manickavasagar Aff. ¶ 7.) On May 30, 2008, Plaintiff was admitted to Southhampton Memorial Hospital. (Pl.'s Opp'n Ex. S.) Plaintiff's chief complaint was "of a draining perirectal abscess on the right cheek buttock over the past week. [Plaintiff] was in his usual state of health when he noticed [the] onset of a swelling on the buttock of his right cheek. The swelling increased in size and subsequently began to drain purulent material." (Pl.'s Opp'n Ex. S.) Subsequent testing of the abscess revealed that Plaintiff had a staph infection. (Pl.'s Opp'n Ex. I.)

## IV. Analysis of Plaintiff's Claims

To survive summary judgment on an Eighth Amendment claim, an inmate must demonstrate: (1) that objectively the deprivation suffered or harm inflicted "was 'sufficiently serious,' and (2) that subjectively the prison officials acted with a

'sufficiently culpable state of mind.'" *Johnson v. Quinones*, 145 F.3d 164, 167 (4th Cir. 1998) (quoting *Wilson v. Seiter*, 501 U.S. 294, 298, 111 S. Ct. 2321, 2324 (1991)).

Under the objective prong for an Eighth Amendment claim challenging the conditions of his or her confinement, the inmate must demonstrate that the deprivation complained of was extreme and amounted to more than the "'routine discomfort'" that is "'part of the penalty that criminal offenders pay for their offenses against society.'" *Strickler v. Waters*, 989 F.2d 1375, 1380 n.3 (4th Cir. 1993) (quoting *Hudson v. McMillian*, 503 U.S. 1, 9, 112 S. Ct. 995, 1000 (1992)). The resulting harm to the inmate is particularly pertinent in assessing whether a distasteful condition was sufficiently extreme to constitute an unconstitutional infliction of punishment. *Id.* at 1381. Thus, "[i]f a prisoner has not suffered serious or significant physical or mental injury as a result of the challenged condition, he simply has not been subjected to cruel and unusual punishment within the meaning of the [Eighth] Amendment." *Id.* Furthermore, in evaluating a prisoner's complaint regarding medical care, the Court is mindful that "society does not expect that prisoners will have unqualified access to health care" or to the medical treatment of their choosing. *Hudson*, 503 U.S. at 9, 112 S. Ct. at 1000 (citing *Estelle v. Gamble*, 429 U.S. 97, 103-04, 97 S. Ct. 285, 290-91 (1976)). In this regard, the right to medical treatment is limited to that treatment which is medically necessary and not to "that which may be considered merely desirable." *Bowring v. Godwin*, 551 F.2d 44, 48 (4th Cir. 1977); *see also Kersh v. Bounds*, 501 F.2d 585, 588-89 (4th Cir. 1974).

13

Under the subjective prong, the inmate must demonstrate that the defendants were deliberately indifferent to his serious medical needs. *See Brown v. Harris*, 240 F.3d 383, 388 (4th Cir. 2001). "Deliberate indifference is a very high standard - a showing of mere negligence will not meet it." *Grayson v. Peed*, 195 F.3d 692, 695 (4th Cir. 1999) (citing *Estelle*, 429 U.S. at 105-06, 97 S. Ct. at 292). This standard requires a plaintiff to introduce evidence from which the finder of fact could conclude that "the official in question subjectively recognized a substantial risk of harm" and "that the official in question subjectively recognized that his actions were 'inappropriate in light of that risk.'" *Parrish ex rel. Lee v. Cleveland*, 372 F.3d 294, 303 (4th Cir. 2004) (quoting *Rich v. Bruce*, 129 F.3d 336, 340 n.2 (4th Cir. 1997)). "To establish that a health care provider's actions constitute deliberate indifference to a serious medical need, the treatment must be so grossly incompetent, inadequate, or excessive as to shock the conscience or to be intolerable to fundamental fairness." *Miltier v. Beorn*, 896 F.2d 848, 851 (4th Cir. 1990) (citing *Rogers v. Evans*, 792 F.2d 1052, 1058 (11th Cir. 1986)). Furthermore, absent exceptional circumstances, an inmate's disagreement with medical personnel with respect to a course of treatment is insufficient to state a cognizable constitutional claim, much less demonstrate deliberate indifference. *See Wright v. Collins*, 766 F.2d 841, 849 (4th Cir. 1985) (citing *Gittlemacker v. Prasse*, 428 F.2d 1, 6 (3d Cir. 1970)).

## A. Alleged Indifference to Plaintiff's Pain

In Claims 6(a) and 8(a), Plaintiff contends that Drs. Henceroth and Manickavasagar were deliberately indifferent to Plaintiff's need for proper pain medication. "It would be nice if after appropriate medical attention pain would immediately cease, its purpose fulfilled; but life is not so accommodating. Those recovering from even the best treatment can experience pain." *Snipes v. DeTella*, 95 F.3d 586, 592 (7th Cir. 1996). Contrary to Plaintiff's suggestion, the Eighth Amendment does not require "prison doctors to keep an inmate pain-free in the aftermath of proper medical treatment." *Id.* So long as a physician responds reasonably to an inmate's complaints of pain, the physician does not violate an inmate's Eighth Amendment rights. *See Brown*, 240 F.3d at 389-90. Because the reasonableness of any such response usually calls for a medical judgment, "[w]hether and how pain associated with medical treatment should be mitigated is for doctors to decide free from judicial interference, except in the most extreme situations." *Snipes*, 95 F.3d at 592.

This is not such an extreme circumstance. *See, e.g., White v. Napoleon*, 897 F.2d 103, 109-10 (3d Cir. 1990). The record reflects Drs. Henceroth and Manickavasagar were attentive to Plaintiff's complaints of pain and prescribed a variety of medications to ease his pain. Such actions reflect reasoned medical judgment, rather than deliberate indifference.[13] *See DeBoer v. Luy*, 70 F. App'x 880, 882 (7th Cir. 2003) (noting that

---

[13] The record reflects Dr. Henceroth was concerned not only with managing Plaintiff's pain, but also with ensuring that Plaintiff proceeded cautiously to avoid reinjuring his recovering hip.

where a prison doctor "had to weigh the efficacy of powerful pain killers against their addictiveness," the district court correctly determined "that '[t]his kind of delicate balancing between the benefits of pain relief and the risk of addiction can be characterized fairly as a classic example of a matter for medical judgment that falls outside the purview of the Eighth Amendment.'" (alteration in original) (quoting *DeBoer v. Luy*, No. 01-C-382-C, 2002 WL 32345414, at *4 (W.D. Wis. June 13, 2002))).

Plaintiff persists that Drs. Henceroth and Manickavasagar acted with deliberate indifference because they did not provide Plaintiff with Tylenol 3, which had previously been effective at reducing his pain, but instead prescribed Tylenol 500 for Plaintiff, even though Plaintiff had informed Dr. Henceroth that Tylenol 500 had not been helpful at reducing his pain. (Pl.'s Decl. ¶ 4.) Given the significant efforts of Drs. Henceroth and Manickavasagar to manage Plaintiff's complaints of pain along with his other medical problems, no reasonable juror could conclude that the decisions to give Tylenol 500 another try after other medications had proved ineffective (as was the case with Percogesic) or had produced dangerous side effects (as was the case with Ultram) was the product of deliberate indifference. *See Self v. Crum*, 439 F.3d 1227, 1232 (10th Cir. 2006) ("[T]he subjective component is not satisfied, absent an extraordinary degree of neglect, where a doctor merely exercises his considered medical judgment."); *Gutierrez v. Peters*, 111 F.3d 1364, 1375 (7th Cir. 1997) (explaining that the court should look to the totality of an inmate's medical care in assessing whether a doctor was deliberately

indifferent to an inmate's medical needs). Accordingly, Claims 6(a) and 8(a) will be dismissed.

### B.      Failure to Discuss Plaintiff's Recent Surgery

In Claim 6(b), Plaintiff contends that Dr. Henceroth violated his rights when he failed to discuss Plaintiff's recent surgery upon Plaintiff's arrival at DCC. Plaintiff, however, has failed to demonstrate, as he must, that he sustained any constitutionally significant injury as a result of lack of communication with Dr. Henceroth about his recent surgery. *Strickler*, 989 F.2d at 1381. Accordingly, Claim 6(b) will be dismissed.

### C.      Lack of Supervised Physical Therapy

In Claim 6(c), Plaintiff insists that Dr. Henceroth violated his rights by not providing Plaintiff with the physical therapy recommended by the doctors at Fauquier Hospital. A "[m]ere difference[] of opinion among medical personnel regarding a patient's appropriate treatment" does not automatically demonstrate deliberate indifference. *Pardue ex rel. Cole v. Fromm*, 94 F.3d 254, 261 (7th Cir. 1996) (citing *Estelle*, 429 U.S. at 107, 97 S. Ct. at 292-93); *White,* 897 F.2d at 109-10. Here, Dr. Henceroth, a board certified orthopaedic surgeon, had the opportunity to observe Plaintiff after his hip surgery. In Dr. Henceroth's medical judgment, Plaintiff did not require physical therapy under the direct supervision of a therapist, but was able to ambulate and do the exercises Plaintiff had been shown at the hospital on his own. (Henceroth Aff. ¶ 5.) Additionally, in Dr. Henceroth's judgment it would have been more hazardous for

Plaintiff to go back and forth to the hospital for therapy than for Plaintiff to do it on his own. (Henceroth Aff. ¶ 5.) Plaintiff simply has not introduced evidence from which a reasonable juror could conclude that Dr. Henceroth acted with deliberate indifference by having Plaintiff conduct his own physical therapy in the assisted living block at DCC. *See Lee*, 372 F.3d at 303 (quoting *Rich*, 129 F.3d at 340 n.2 ); *Jones v. Johnson*, No. 7:08cv00492, 2009 WL 3614476, at *6 (W.D. Va. Oct. 30, 2009), *remanded on other grounds*, No. 09-8263, 2010 WL 2640158, at *1 (4th Cir. June 29, 2010). Accordingly, Claim 6(c) will be dismissed.

## D. Termination of Assistance with Regard to Daily Activities

In Claim 7, Plaintiff faults Nurse Connor for temporarily preventing Ms. Lewis from assisting Plaintiff with his daily living activities in April of 2008. Plaintiff has failed to demonstrate that he sustained any constitutionally significant injury as a result of the temporary termination of assistance from Ms. Lewis. *See Strickler*, 989 F.2d at 1381. Accordingly, Claim 7 will be dismissed.

In Claim 6(d), Plaintiff contends that Dr. Henceroth subjected him to cruel and unusual punishment by permanently discharging Plaintiff from the assisted living pod at DCC. Once again, Plaintiff has failed to demonstrate that he sustained any constitutionally significant injury as a result of his discharge from the assisted living pod at DCC. *Id.* Furthermore, Plaintiff's disagreement with Dr. Henceroth's decision in this regard is not sufficient to demonstrate Dr. Henceroth acted with deliberate indifference.

*See Wright*, 766 F.2d at 849 (citing *Gittlemacker*, 428 F.2d at 6). Accordingly, Claim 6(d) will be dismissed.

### E.     Alleged Indifference to Plaintiff's Infection

In Claim 8(b), Plaintiff alleges that Dr. Manickavasagar ignored Plaintiff's need for medical attention with respect to the risk that he had a staph infection. Plaintiff, however, fails to direct the Court to any evidence that suggests that Dr. Manickavasagar perceived that Plaintiff had an infection or faced a substantial risk of contracting a staph infection. *See Self*, 439 F.3d at 1232 (explaining that a claim for denial of adequate medical care against a medical professional is "actionable only in cases where the need for additional treatment or referral to a medical specialist is obvious"). When Dr. Manickavasagar saw Plaintiff on April 7, 2008, Plaintiff did not complain to Dr. Manickavasagar about wound care issues or bumps. (Manickavasagar Aff. ¶ 5.) Although Plaintiff did request that Dr. Manickavasagar take a culture of Plaintiff's wound on May 9, 2008, Plaintiff has failed to introduce evidence from which a jury could conclude that as of May 9, 2008, Dr. Manickavasagar perceived that Plaintiff required further diagnostic testing with respect to the risk of infection. *See Self*, 439 F.3d at 1232-33 (concluding that a plaintiff could demonstrate deliberate indifference where "a medical professional completely denies care although presented with recognizable symptoms which potentially create a medical emergency, . . . knowing that medical protocol requires referral or minimal diagnostic testing to confirm the symptoms, [yet] sends the inmate

back to his cell"); *Lee*, 372 F.3d at 303 (quoting *Brice v. Va. Beach Corr. Ctr.,* 58 F.3d 101, 105 (4th Cir. 1995)). Indeed, according to Dr. Manickavasagar, as of May 9, 2008, Plaintiff's hip wound had healed completely.[14] (Manickavasagar Aff. ¶ 6.) Accordingly, Claim 8(b) will be dismissed.

## V. Conclusion

Defendants' motion for summary judgment will be GRANTED. All claims against Henceroth, Connor, and Manickavasagar will be dismissed.

An appropriate Order shall accompany this Memorandum Opinion.

/s/
HENRY E. HUDSON
UNITED STATES DISTRICT JUDGE

Date: Sept. 24, 2010
Richmond, Virginia

---

[14] The record indicates that the symptoms of Plaintiff's infection did not become evident until the end of May of 2008. (Manickavasagar ¶ 7; Pl.'s Opp'n Ex. S.) Moreover, Plaintiff fails to direct the Court to competent evidence demonstrating that improper care for his surgical wound caused his subsequent staff infection.