## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF VIRGINIA
### Richmond Division

JAMES BOWMAN,         )
                           )
     Plaintiff,        )
                           )
v.                      )         Civil Action No. 3:08CV449-HEH
                           )
GENE JOHNSON, *et al.*,   )
                           )
     Defendants.     )

### MEMORANDUM OPINION
### (Denying Motions For Summary Judgment Filed By
### Defendants Thomas And Sykes And Granting Motion For
### Summary Judgment Filed By Defendant Toney)

James Bowman, a former Virginia inmate, brings this 42 U.S.C. § 1983 action. Mr.

Bowman has a history of hip problems, which he contends the medical staff did not adequately

accommodate. The Court previously dismissed numerous claims by Mr. Bowman against

additional defendants. As pertinent here, Mr. Bowman contends that he is entitled to relief upon

the following grounds:[1]

|  |  |
|---|---|
| Claim 1 | Ms. Thomas failed to ensure that Mr. Bowman was housed at an appropriate facility with appropriate medical equipment after Mr. Bowman's October 2, 2007 hip surgery. |
| Claim 2 | Nurse Sykes failed to provide Mr. Bowman with adequate toilet facilities after Mr. Bowman's October 2, 2007 hip surgery. |

---

[1] With respect to the remaining claims, Bowman names as defendants the following
individuals: Cathy Thomas, Health Care Administrator for the Eastern Region of the Virginia
Department of Corrections ("VDOC"); Shawn Sykes, a nurse at Coffeewood Correctional Center
("CWCC"); and Dr. Toney, a physician at Powhatan Medical Unit ("PMU"). According to Dr.
Toney's submissions, his name is properly spelled "Toney." The Court will use this spelling,
rather than that provided by Mr. Bowman.

| Claim 5 | When Mr. Bowman was transferred to PMU, Dr. Toney failed |
| | (a) | to provide Mr. Bowman with the medical equipment and assistance his prior physician had requested; and, |
| | (b) | to provide adequate medical care after Mr. Bowman's hip popped out of place and he was discharged back to PMU on November 3, 2007. |

The matter is before the Court on the Motions for Summary Judgment filed by Ms. Thomas, Nurse Sykes, and Dr. Toney (collectively "Defendants"). Mr. Bowman has responded to each motion. The Motions for Summary Judgment are ripe for disposition.

## I. STANDARD FOR SUMMARY JUDGMENT

Summary judgment must be rendered "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). It is the responsibility of the party seeking summary judgment to inform the court of the basis for the motion, and to identify the parts of the record which demonstrate the absence of a genuine issue of material fact. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). "[W]here the nonmoving party will bear the burden of proof at trial on a dispositive issue, a summary judgment motion may properly be made in reliance solely on the pleadings, depositions, answers to interrogatories, and admissions on file." *Id.* at 324 (internal quotation marks omitted). When the motion is properly supported, the nonmoving party must go beyond the pleadings and, by citing affidavits or "'depositions, answers to interrogatories, and admissions on file,' designate 'specific facts showing that there is a genuine issue for trial.'" *Id.* (quoting former Fed. R. Civ. P. 56(c) and 56(e) (1986)). In reviewing a summary judgment motion, the court "must draw all justifiable inferences in favor of the nonmoving party." *United States v. Carolina Transformer Co.*, 978 F.2d 832, 835 (4th Cir. 1992) (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986)). Nevertheless, the nonmoving party cannot

2

"'create a genuine issue of material fact through mere speculation or the building of one inference upon another.'" *Emmett v. Johnson*, 532 F.3d 291, 297 (4th Cir. 2008) (quoting *Beale v. Hardy*, 769 F.2d 213, 214 (4th Cir. 1985)). In order to ensure that the parties shoulder their respective burdens for a motion for summary judgment, Local Civil Rule 56(B) requires:

> Each brief in support of a motion for summary judgment shall include a specifically captioned section listing all material facts as to which the moving party contends there is no genuine issue and citing the parts of the record relied on to support the listed facts as alleged to be undisputed. A brief in response to such a motion shall include a specifically captioned section listing all material facts as to which it is contended that there exists a genuine issue necessary to be litigated and citing the parts of the record relied on to support the facts alleged to be in dispute. In determining a motion for summary judgment, the Court may assume that facts identified by the moving party in its listing of material facts are admitted, unless such a fact is controverted in the statement of genuine issues filed in opposition to the motion.

E.D. Va. Loc. Civ. R. 56(B).

Of course, the facts offered by affidavit must be in the form of admissible evidence. *See* Fed. R. Civ. P. 56(c)(2). In this regard, the statement in the affidavit or sworn declaration "must be made on personal knowledge . . . and show that the affiant or declarant is competent to testify on the matters stated." Fed. R. Civ. P. 56(c)(4). Furthermore, summary judgment affidavits must "set out facts." *Id.* Therefore, "summary judgment affidavits cannot be conclusory . . . or based upon hearsay." *Evans v. Techs. Applications & Serv. Co.*, 80 F.3d 954, 962 (4th Cir. 1996) (citing *Rohrbough v. Wyeth Labs., Inc.*, 916 F.2d 970, 975 (4th Cir. 1990); *Md. Highways Contractors Ass'n v. Maryland*, 933 F.2d 1246, 1252 (4th Cir. 1991)). Thus, the parties' conclusory allegations will not be considered in reviewing the motion for summary judgment.

## II. MS. THOMAS'S MOTION FOR SUMMARY JUDGMENT

In support of her Motion for Summary Judgment, Ms. Thomas has submitted affidavits, copies of Mr. Bowman's grievance material, copies of Mr. Bowman's institutional request forms, and a copy of the VDOC Operating Procedures for Medical Screening, Classification, and Levels of Care. (Thomas's Br. Supp. Mot. Summ J. (Dk. No. 24) Ex. 1 ("1st Thomas Aff."); Thomas's Br. Supp. Supp'l Mot. Summ. J. (Dk. No. 83) Ex II ("Thomas Supp'l Aff."), Encl. A ("10-9-07 Emerg. Grievance"), Encl. B ("Resp. to 10-9-07 Emerg. Grievance"), Encl. C ("Response to 6-21-08 Inmate Request Form"), Encl. D ("Bowman Aff."), Encl. E ("VDOC Operating Procedures").) In response, Mr. Bowman filed a sworn statement. (Pl.'s Sworn Statement Opp'n Thomas's Supp'l Mot. Summ. J. (Dk. No. 96).) Mr. Bowman also submitted a brief in opposition to the motion for summary judgment.[2]

Both Thomas's and Bowman's submissions suffer from a number of evidentiary deficiencies. First, Thomas relies upon the VDOC Operating Procedures to support her position that she was not responsible "for transferring offenders either from a hospital, infirmary, or a population to a facility that can provide an appropriate health care environment." (Thomas's Br. Supp. Supp'l Mot. Summ. J. ¶ 8.) Bowman correctly notes that the copy of the relevant VDOC

---

[2] In some of his certificates of service, Mr. Bowman states, "I affirm that all [of] the information provided to the Court by me is true and correct to the best of my knowledge under the penalty of perjury." (*See, e.g.*, Dk. No. 89, at 3, Dk. No. 96, at 12, Dk. No. 97, at 18.) Such remarks do not transform any of the statements in Mr. Bowman's briefs or correspondence into a sworn declaration. The Court previously informed Mr. Bowman that the Court "will not consider as evidence in opposition to any motion for summary judgment a memorandum of law and facts that is sworn to under penalty of perjury. Rather, any verified allegations must be set forth in a separate document." (May 22, 2009 Mem. Order 2.)

Operating Procedures that Thomas appended to her motion for summary judgment became effective on March 1, 2010; therefore, they are of little use in assessing Ms. Thomas's responsibilities in the fall of 2007.

Ms. Thomas also challenges the documents that Bowman has submitted to demonstrate that she bore some responsibility for his housing assignment in the fall of 2007. In his affidavit, Mr. Bowman states, on October 5, 2007, he spoke to Mr. Hays, the Medical Supervisor at CWCC. (Bowman Aff.) In that conversation, Mr. Hays relayed to Mr. Bowman that

> Cathy Thomas, DON, Director of Nursing, Richmond, told L. Hays to bring me back to CWCC. Cathy Thomas knew in advance, according to L. Hays, who told me he told Cathy Thomas of my special medical needs and that CWCC was not equip [sic] to handle my medical needs, yet Cathy Thomas still told L. Hays to have me sent back to CWCC.

(*Id.*)[3] Mr. Bowman also submitted other documents that suggest Cathy Thomas was the Director of Nursing for the VDOC, or the Nursing Supervisor for the Eastern Region of the VDOC. (*See, e.g.*, Response to 6-21-08 Inmate Request Form.) Ms. Thomas contends that the Court should disregard the above submissions because "[t]he documents filed by Plaintiff . . . were not documents responded to by Thomas or documents of which she has any knowledge." (Thomas's Br. Supp. Supp'l Mot. Summ. J. ¶ 9.) This contention is not coupled with any citation to relevant legal authority. While there may be valid evidentiary objections to the admissibility of Mr. Bowman's evidence, Ms. Thomas has not adequately raised such objections.[4] In its current form,

---

[3] The Court has corrected the capitalization and punctuation in the quotations to Mr. Bowman's submissions.

[4] For example, although Bowman's affidavit is notarized, there is no indication the notary administered an oath, *see McCoy v. Robinson*, 3:08CV555, 2010 WL 3735128, at *2 (E.D. Va. Sept. 22, 2010), and many of other documents offered by Bowman to demonstrate that Ms. Thomas was responsible for his transfer to CWCC appear to be inadmissible hearsay.

Ms. Thomas's motion for summary judgment does not fulfill her obligation to provide the Court "with a citation of the authorities upon which the movant relies." E.D. Va. Loc. Civ. R. 7(F)(1). Furthermore, Ms. Thomas has not complied with the requirements of Local Civil Rule 56(B) by separately identifying the facts she contends are not disputed and citing the appropriate portions of the record. *See* E.D. Va. Loc. Civ. R. 56(B). Given the foregoing procedural and evidentiary deficiencies, the Court declines to address the merits of Ms. Thomas's current motion for summary judgment.

Accordingly, Ms. Thomas's motion for summary judgment will be DENIED WITHOUT PREJUDICE to renew within twenty-one (21) days of the date of entry hereof. Any new motion for summary judgment and opposition thereto must comport with the Local Rules for the United States District Court for the Eastern District of Virginia. To the extent either party contends that the Court should not consider evidence submitted by the opposing party, he or she must identify the specific evidence contested, and the legal basis for that contention.

### III. NURSE SYKES'S MOTION FOR SUMMARY JUDGMENT

#### A. Summary of Pertinent Submissions

In support of her Motion for Summary Judgment, Nurse Sykes has submitted an affidavit and a copy of a portion of Mr. Bowman's medical records. Nurse Sykes also relies upon certain admissions Mr. Bowman made in his complaint.[5] In response, Mr. Bowman has submitted an

---

[5] *See Hughes v. Vanderbilt Univ.*, 215 F.3d 543, 549 (6th Cir. 2000) (citing cases for the proposition that "[p]laintiffs are bound by admissions in their pleadings, and a party cannot create a factual issue by subsequently filing a conflicting affidavit"); *Bright v. QSP, Inc.*, 20 F.3d 1300, 1305 (4th Cir. 1994); *Morales v. Dep't of Army*, 947 F.2d 766, 769 (5th Cir. 1991) ("'Factual assertions in pleadings are judicial admissions conclusively binding on the party that made them.'" (quoting *Davis v. A.G. Edwards & Sons, Inc.*, 823 F.2d 105 (5th Cir. 1987))).

opposing brief, which contains his own sworn declaration. (Dk. No. 97, at 1–7 ("Bowman Decl. I").)

Nurse Sykes suggests that the Court is not required to accept Mr. Bowman's version of events. (Sykes Reply Br. Supp. Mot. Summ. J. 4 (citing *Scott v. Harris*, 550 U.S. 372, 376–80 (2007)).[6] However, Nurse Sykes fails to direct this Court to medical records or other evidence that renders Mr. Bowman's account so contradictory that no reasonable juror would credit it.[7] Therefore, Mr. Bowman "is entitled 'to have the credibility of his evidence as forecast assumed, his version of all that is in dispute accepted, [and] all internal conflicts in it resolved favorably to him.'" *Overstreet v. Ky. Cent. Life Ins. Co.*, 950 F.2d 931, 937 (4th Cir. 1991) (quoting *Charbonnages de France v. Smith*, 597 F.2d 406, 414 (4th Cir. 1979)). In light of the foregoing principles and submissions, the following facts are established for purposes of Nurse Sykes's Motion for Summary Judgment.

---

[6] In *Scott*, the Supreme Court concluded the Court was not bound on summary judgment to accept the plaintiff's version of a police chase where that version was refuted by a videotape of the chase presented by the defendants. *Scott*, 550 U.S. at 380. The Supreme Court observed, "There are no allegations or indications that this videotape was doctored or altered in any way, nor any contention that what it depicts differs from what actually happened. *Id.* at 378. In those circumstances, the Supreme Court stated, "When opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment." *Id.* at 380.

[7] The Court notes that, since he submitted the Complaint, Mr. Bowman has revised the facts pertaining to his claim against Nurse Sykes. For example, in his Complaint, Mr. Bowman insisted that his claims against Nurse Sykes were all grounded in her conduct towards him on October 5, 2007. On that day, Mr. Bowman claimed that he had multiple conversations with her regarding the need for a toilet seat heightener. (Compl. Claim 2, at 1-4). Mr. Bowman supported his assertion that his contact with Nurse Sykes had occurred on October 5, 2007, by referencing his discharge instructions from Fauquier Hospital (Compl. Claim 2 Ex. U) and Culpeper Regional Hospital (Compl. Claim 2 Ex. T). Now, Mr. Bowman swears that the conversations with Nurse Sykes occurred on both October 5 and October 6, 2007. (Bowman Decl. I ¶¶ 7–34.)

## B. Summary of Pertinent Facts

On October 2, 2005, Mr. Bowman was taken from CWCC to Fauquier Hospital for hip surgery. (Compl. Claim 1, at 1.) On October 5, 2005, Mr. Bowman was returned from Fauquier Hospital with "surgeon's orders." (Compl. Claim 2, at 1.) Mr. Bowman's discharge instructions stated that Mr. Bowman should not bend his hip at a more than 90-degree angle. (Compl. Claim 2 Ex. U, at 1.) The discharge instructions state that Mr. Bowman was not to sit on low surfaces. (*Id.*) Additionally, Mr. Bowman was instructed to "[b]uild up a low chair with pillows." (*Id.* at 2.)

### 1. The First Fall

Upon his return from CWCC, Mr. Bowman was placed in a medical isolation cell with a low toilet. (Compl. Claim 2, at 1.) Mr. Bowman asked Mr. Hays, the Medical Supervisor at CWCC for a toilet seat heightener. (*Id.*) Mr. Hays told Mr. Bowman that he did not have a toilet seat heightener and told Mr. Bowman he should be able to use the toilet in his cell. (*Id.*) When Mr. Bowman tried to use the toilet in his cell, he fell and hit his arm and back. (*Id.* at 2.)

### 2. The Second Fall

According to Mr. Bowman, "I told Nurse Sykes I needed a toilet heightener as ordered by my surgeons." (Bowman Decl. I ¶ 7.) Mr. Bowman asserts that Nurse Sykes responded in a "nasty voice" that "'You can use that toilet!'" (*Id.* ¶ 8.) Nurse Sykes "point[ed] to the in-cell, non-handicap low toilet." (*Id.*) Nurse Sykes then walked away. (*Id.*) Mr. Bowman then attempted to use the in-cell toilet and fell. (*Id.* ¶¶ 9, 10.) Mr. Bowman was taken to the emergency room at the Culpeper Regional Hospital. (*Id.* ¶ 11.) Mr. Bowman insists that he was in severe pain. (*Id.* ¶ 12.) Some hours later, but still on October 5, 2007, Mr. Bowman was

returned to CWCC. (*Id.* ¶ 13.) Mr. Bowman's discharge orders indicated that he needed an elevated toilet seat. (*Id.*; Compl. Claim 2 Ex T.)

### 3. Mr. Bowman's Fall After the Return from Culpeper Regional Hospital

Upon his return from Culpeper Regional Hospital, Mr. Bowman was placed back in the same medical isolation cell. (Bowman Decl. I ¶ 15.) At approximately 11:45 p.m. on October 5, 2007, Mr. Bowman was screaming in his cell that "Coffeewood was not equipped to take care of his medical needs." (Sykes Aff. ¶¶ 9–11.) Mr. Bowman "requested a toilet seat heightener." (*Id.* ¶ 11.) Nurse Sykes explained to Mr. Bowman that she had no ability to move him to another location. (*Id.* ¶¶ 11, 12.) Nurse Sykes further explained that no toilet seat heightener existed at CWCC, she had no means to obtain one, but she could provide him with an alternative solution. (*Id.*) This alternative consisted of two stacked chairs and a bedpan. (*Id.*; Sykes's Mem. Supp. Mot. Summ. J. Ex. 2.) Nurse Sykes instructed Mr. Bowman "to use [the] call bell to get up for transfers and ambulation." (Sykes's Mem. Supp. Mot. Summ. J. Ex. 2.) According to Nurse Sykes, "[t]he 11:45 p.m. was the only encounter I had with Mr. Bowman on October 5, 2007. I did not interact with Mr. Bowman again during that shift or the following shift. I was on duty again from 11:30 p.m on the night of October 6, 2007, until 9:30 a.m. on October 7, 2007. I was not on duty on the nights of October 7, 2007, or October 8, 2007." (Sykes Aff. ¶ 15.)

According to Mr. Bowman, his first encounter with Nurse Sykes upon his return from the Culpeper Regional Hospital occurred on October 6, 2007. (Bowman Decl. I ¶¶ 15–17.) Contrary to the account provided by Nurse Sykes, Mr. Bowman claims that, at that time, Nurse Sykes

continued to deny him "a toilet heightener and all other forms of medical equipment and help to prevent hip dislocation." (Bowman Decl. I ¶ 15.)

> I beat on my medical isolation cell door—I used the call button but no one came—Sykes showed up, stating "WHAT!"
>
> I told Sykes I need a toilet heightener. Nurse Sykes said, "Didn't I tell you yesterday we don't have one?" So I said, "You help me then." Sykes refused.
>
> I said, "Well, how am I suppose to use the toilet?"
>
> Nurse Sykes told me, "Use that toilet," pointing to the in-cell low toilet—smiling.
>
> I told Nurse Sykes, "The doctor at the hospital told me that I must use an elevated toilet seat or get assistance to keep my hip from moving the wrong way to prevent pain and hip dislocation."
>
> Nurse Sykes told me, "Then the doctor at the hospital should have gave you one."
>
> Sykes walked away.
>
> With no other option and still lock[ed] in a non-handicap accessible medical isolation cell and still being denied assistance/help from Sykes, I tried to use the toilet again.
>
> On [October 6, 2007,] I fell again trying to use a too low toilet without proper medical equipment and or any assistance/help. Sykes refused to help me.
>
> I was taken back to Culpeper Regional Hospital [Emergency Room] . . . .
>
> Hours later I was return[ed] to CWCC.
>
> Soon as I got back to CWCC, I was locked right back in the same non-handicap accessible medical isolation cell . . . and denied all needed medical equipment and assistance . . . .
>
> Sometime later I told Nurse Sykes she never brought the bed pan back I asked her for.
>
> Sykes told me she could not find one.
>
> I told Nurse Sykes I really had to go number 2.
>
> Sykes said, "You should'a use[d] the bathroom at the hospital!"
>
> I told Nurse Sykes I did, but I gotta go again.
>
> Sykes told me, you either use that toilet—the in-cell toilet—or shi* on yourself.
>
> Out of ideas and time, I defecated on myself; it was either that or risk another fall and possible hip dislocation. I was denied help cleaning myself and could not do it alone. Sykes refuse[d] to help me. I was forced to sit in my own waste for over 2 days.

(Bowman Decl. I ¶¶ 16–36 (paragraph numbers omitted).) Nurse Sykes swears that "Mr.

Bowman never asked me for a shower and never reported that he defecated on himself. I never

refused Mr. Bowman a shower. I was never aware of him defecating in his pants. I was never aware of anyone denying him the ability or the assistance to clean himself." (Sykes Aff. ¶ 16.)

## C.    Analysis

Nurse Sykes contends that she is entitled to summary judgment because Mr. Bowman cannot demonstrate that she acted with deliberate indifference and because Mr. Bowman failed to comply with the requirements of the Virginia Medical Malpractice Act ("VMMA") and obtain a certificate from an expert prior to pursuing a medical malpractice claim. *See* Va. Code Ann. § 8.01-20.1 (West 2010). For the reasons set forth below, Sykes's Motion for Summary Judgment will be denied.

### 1.    Eighth Amendment

To survive summary judgment on an Eighth Amendment[8] claim, an inmate must demonstrate: (1) that objectively the deprivation suffered or harm inflicted "was 'sufficiently serious,' and (2) that subjectively the prison officials acted with a 'sufficiently culpable state of mind.'" *Johnson v. Quinones,* 145 F.3d 164, 167 (4th Cir. 1998) (quoting *Wilson v. Setter,* 501 U.S. 294, 298 (1991)). Under the objective prong for an Eighth Amendment claim challenging the conditions of his or her confinement, the inmate must demonstrate that the deprivation complained of was extreme and amounted to more than the "'routine discomfort'" that is "'part of the penalty that criminal offenders pay for their offenses against society.'" *Strickler v. Waters,* 989 F.2d 1375, 1380 n.3 (4th Cir. 1993) (quoting *Hudson v. McMillian,* 503 U.S. 1, 9 (1992)). Furthermore, in evaluating a prisoner's complaint regarding medical care, the Court is mindful

---

[8] "Excessive bail shall not be required, nor excessive fines imposed, nor cruel and unusual punishments inflicted." U.S. Const. amend. VIII.

that "society does not expect that prisoners will have unqualified access to health care" or to the medical treatment of their choosing. *Hudson*, 503 U.S. at 9 (citing *Estelle v. Gamble*, 429 U.S. 97, 103–04 (1976)).

Under the subjective prong, the inmate must demonstrate that the defendant was deliberately indifferent to his serious medical needs. *See Brown v. Harris,* 240 F.3d 383, 388 (4th Cir. 2001). "Deliberate indifference is a very high standard—a showing of mere negligence will not meet it." *Grayson v. Peed,* 195 F.3d 692, 695 (4th Cir. 1999) (citing *Estelle*, 429 U.S. at 105-06). This standard requires a plaintiff to introduce evidence from which the finder of fact could conclude that "the official in question subjectively recognized a substantial risk of harm" and "that the official in question subjectively recognized that his [or her] actions were 'inappropriate in light of that risk.'" *Parrish ex rel. Lee v. Cleveland*, 372 F.3d 294, 303 (4th Cir. 2004) (quoting *Rich v. Bruce*, 129 F.3d 336, 340 n.2 (4th Cir. 1997)).

Nurse Sykes contends that she cannot be found to have acted with deliberate indifference because there was no toilet seat heightener at CWCC and she provided Mr. Bowman with the acceptable alternative of a bed pan. Although it is undisputed that CWCC did not have a toilet seat heightener, Mr. Bowman disputes whether Nurse Sykes ever timely offered him an appropriate alternative. Specifically, according to Mr. Bowman, prior to his first trip to the Culpeper Regional Hospital, he informed Nurse Sykes that he required a toilet seat heightener and she told him to use the toilet in his cell. (Bowman Decl. I ¶¶ 7, 8.) Upon attempting to use the in-cell toilet, Mr. Bowman fell and was taken to the Culpeper Regional Hospital. To the extent Nurse Sykes denies that this conversation occurred, that constitutes a material dispute of fact.

Next, Nurse Sykes contends that upon Mr. Bowman's return from Culpeper Regional Hospital, she provided Mr. Bowman with the acceptable alternative of two stacked chairs and a bed pan and assistance from medical staff. Mr. Bowman disputes this fact and swears that, upon his return from Culpeper Regional Hospital, Nurse Sykes continued to deny him "all other forms of medical equipment and help to prevent hip dislocation," which resulted in a second fall and second trip the Culpeper Regional Hospital. (Bowman Decl. I ¶ 15.) Furthermore, Mr. Bowman claims that when he once again returned to CWCC, Nurse Sykes continued to refuse to provide adequate assistance, which resulted in him defecating in his pants.

Nurse Sykes insists that Mr. Bowman is bound by the admission in his Complaint, wherein he acknowledges that Nurse Sykes provided him with a chair and bedpan as an alternative to a toilet seat heightener. (Compl. Claim 2, at 4 ("Sykes told me, 'You either use that toilet or use the bathroom in your pants or use a chair.'").) Nevertheless, according to Mr. Bowman, at his time of need, even if there was a chair available, no bedpan was available, and Nurse Sykes refused to obtain one despite Mr. Bowman's pleas. (Bowman Decl. I ¶¶ 29–35.) Furthermore, according to Mr. Bowman, after he defecated on himself, Nurse Sykes refused to help him clean himself.

Nurse Sykes also argues that she did not act with deliberate indifference in refusing to help Mr. Bowman clean himself because, according to the Complaint, she agreed to get Mr. Hays, who also refused to help Mr. Bowman clean himself. (Sykes Mem. Supp. Mot. Summ. J. 12–13.) Given the evidence submitted by Mr. Bowman and the lack of citation to any pertinent authority for this argument, Nurse Sykes fails to demonstrate these alleged actions defeat Mr. Bowman's showing of deliberate indifference. Furthermore, the record supports a reasonable

inference that Nurse Sykes was aware that Mr. Bowman, who had undergone hip surgery days earlier, would remain seated in his own feces for a constitutionally intolerable time if she refused Mr. Bowman assistance in cleaning himself. *See Bowman v. Johnson*, No. 3:08cv449-HEH, 2010 WL 1225693, at *5 (E.D. Va. Mar. 26, 2010) (citing *LaFaut v. Smith,* 834 F.2d 389, 392–94 (4th Cir. 1987); *DeSpain v. Uphoff,* 264 F.3d 965, 974 (10th Cir. 2001)). Accordingly, Nurse Sykes's argument that Mr. Bowman has failed to establish an Eighth Amendment claim will be rejected.

### 2. Alleged Failure to Comply with VMMA

Section 8.01-20.1 of the Virginia Code provides in pertinent part:

> Every motion for judgment, counter claim, or third party claim in a medical malpractice action, at the time the plaintiff requests service of process upon a defendant, or requests a defendant to accept service of process, shall be deemed a certification that the plaintiff has obtained from an expert witness whom the plaintiff reasonably believes would qualify as an expert witness pursuant to subsection A of § 8.01-581.20 a written opinion signed by the expert witness that, based upon a reasonable understanding of the facts, the defendant for whom service of process has been requested deviated from the applicable standard of care and the deviation was a proximate cause of the injuries claimed. This certification is not necessary if the plaintiff, in good faith, alleges a medical malpractice action that asserts a theory of liability where expert testimony is unnecessary because the alleged act of negligence clearly lies within the range of the jury's common knowledge and experience.

Va. Code Ann. § 8.01-20.1 (West 2011). Nurse Sykes contends that Mr. Bowman's failure to obtain an expert certification bars Mr. Bowman's Eighth Amendment claims. Nurse Sykes fails to cite to any case where a court has applied the foregoing section to bar an Eighth Amendment claim. *Cf. Brembry v. United States*, No. 7:10-cv-388, 2011 WL 121741, at *8–11 (W.D. Va. Jan. 13, 2011) (dismissing inmate's Federal Tort Claims Action for medical practice pursuant to Va. Code § 8.01-20.1, but dismissing Eighth Amendment claim for denial of adequate medical

care on the merits). "There is nothing to indicate . . . that § 1983 plaintiffs must also comply with § 8.01-20.1." *Motley v. Harris*, 1:09cv797 (LMB/IDD), 2010 WL 3430820, at *3 (E.D. Va. Aug. 27, 2010) (citing *Bowman*, 2010 WL 1225693, at *6). Accordingly, the Court rejects Nurse Sykes's argument that the failure to comply with the VMMA warrants dismissal of Mr. Bowman's Eighth Amendment claim.

## IV. DR. TONEY'S MOTION FOR SUMMARY JUDGMENT

In support of his motion for summary judgment, Dr. Toney submitted his own affidavit and a comprehensive copy of Mr. Bowman's medical records. Mr. Bowman has submitted his own sworn statement, some medical records, and prison grievance material.[9] In his sworn statement, Mr. Bowman sets forth very few specific facts. Rather, he largely confines himself to making conclusory assertions. For example, Mr. Bowman swears that "Plaintiff's surgeon's orders could not be follow[ed] by PMU medical staff because the needed equipment to follow Plaintiff's surgeon's order was not made available to Plaintiff, though Dr. Toney, being the medical authority at PMU, could have had Plaintiff transferred to a facility where that medical equipment was available . . . ." (Dk. No. 89 ("Bowman Decl. II") ¶ 4.) Additionally, without any elaboration with respect to whom he asked for help, or what assistance he needed, Mr. Bowman simply swears that "from [November 3, 2007] until [November 12, 2007,] plaintiff was forced to lay around and suffer with his hip dislocated, being denied all forms of medical treatment, help/assistance, medical equipment, etc. by Dr. Toney, the medical authority at PMU." (*Id.* ¶ 9.) Such statements are insufficient to establish any relevant fact. *United States v. Roane*, 378 F.3d

---

[9] Of course, the unsworn statements in Mr. Bowman's grievances and his opposing brief generally do not constitute admissible evidence. *See United States v. White*, 366 F.3d 291, 300 (4th Cir. 2004) (emphasizing that unsworn argument does not constitute evidence).

382, 400–01 (4th Cir. 2004) (observing that "[a]iry generalities, conclusory assertions and hearsay statements [do] not suffice to stave off summary judgment" ) (alterations in original; internal quotation marks omitted). The deficiencies of Mr. Bowman's affidavit are compounded by the fact that Mr. Bowman's opposing brief does not contain a Statement of Disputed Facts that comports with Local Civil Rule 56(B).[10] In light of the foregoing principles and submissions, the following facts are established for purposes of Dr. Toney's Motion for Summary Judgment.

### A.    Summary of Pertinent Facts

On or about October 4, 2007, prior to coming to PMU, Mr. Bowman had total left hip arthroplasty, or hip replacement surgery. (Toney Mem. Supp. Mot. Summ. J. Ex. 1 ("Toney Aff.") ¶ 5, Ex. A ("Medical Rec.") 51). The hip precaution sheets given to Mr. Bowman following his October 4, 2007 surgery indicated that Mr. Bowman could not sit on low surfaces, cushions or pillows, that low seats should be built up, that he should not put his legs together or cross them, that he should maintain a hip angle of greater than 90 degrees, that he was not to cross his legs or ankles or turn his hip inwards, and that he was to use an elevated toilet seat for six weeks after surgery. (Toney Aff. ¶ 6; Medical Rec. 462–65.)

---

[10] Mr. Bowman did not comply with Local Civil Rule 56(B)'s requirement that his brief contain "a specifically captioned section listing all material facts as to which it is contended that there exists a genuine issue necessary to be litigated and citing the parts of the record relied on to support the facts alleged to be in dispute." E.D. Va. Loc. Civ. R. 56(B). Although Mr. Bowman's brief contained such a separately captioned section, he failed to cite to any portion of the record "relied on to support the facts alleged to be in dispute." *Id.* Therefore, the Court will generally assume that facts identified by Dr. Toney in his listing of material facts are admitted. *Id.*

On or about October 22, 2007, Mr. Bowman fell while he was in the shower at CWCC and dislocated his surgically repaired hip. (Toney Aff. ¶ 5; Medical Rec. 51.) On or about October 23, 2007, Dr. Christopher J. Brown, at Fauquier Hospital, noted that Mr. Bowman had dislocated his left total hip prosthesis. (*Id.*) He also noted that Mr. Bowman might require an "'open [surgical] reduction' of the left hip." (Toney Aff. ¶ 5; Medical Rec. 51–52 (alteration in original).) On or about October 23, 2007, a closed reduction to repair Mr. Bowman's dislocated left hip replacement was attempted. (Toney Aff. ¶ 5; Medical Rec. 49–50.) Due to Mr. Bowman's extensive medical history, including possible diabetes, hypertension, peripheral edema, and morbid obesity, he was a higher risk for surgical complications. (Toney Aff. ¶ 6; Medical Rec. 430.)

On October 26, 2007, Mr. Bowman was released from Fauquier Hospital and sent to the PMU infirmary. (Toney Aff. ¶ 8; Medical Rec. 31.) Mr. Bowman was continually monitored and cared for during his approximately two-week stay in the infirmary. (*See generally*, Toney Aff.) In this regard, on October 26, 2007, no distress was noted and Mr. Bowman was walking short distances with a walker. (Toney Aff. ¶ 8; Medical Rec. 27, 31.)

On October 27, 2007, Mr. Bowman was given a wedge to assist with his hip positioning while in bed, had his blood pressure checked, refused medications because of feared side effects, was given medications for fever, and asked about physical therapy. (Toney Aff. ¶ 8; Medical Rec. 26–28.) On October 28, 2007, Mr. Bowman's staples were noted to be intact, and it was noted that he was walking with a walker. (Toney Aff. ¶ 8; Medical Rec. 26.)

On October 29, 2007, Dr. Toney examined Mr. Bowman. (Toney Aff. ¶ 9; Medical Rec. 77–78.) Dr. Toney's impression at that time was that Mr. Bowman had a left hip replacement,

repair of left hip (non-surgical manipulation), that he was obese, that he was a questionable adult onset diabetic, that he was hypertensive and angry. (*Id.*) Dr. Toney ordered a plan "as per orders," which included Dr. Toney's orders as well as those from the hospital. (*Id.*) He ordered a wound culture for Mr. Bowman's surgical wound which came back positive for a staph infection that was already being treated by Bactrim prescribed by Dr. Toney. (Toney Aff. ¶ 9; Medical Rec. 85.)

On October 29, 2007, Dr. Toney ordered that: Mr. Bowman be provided Bactrim two times per day for ten days; Lovenox (anti-coagulant for blood clotting); Bolace 100 mg daily (stool softener routinely administered to post-operative patients); hctz hydrochorathyzide 50 mg per day for 30 days (for blood pressure); blood sugars tid (check three times per day, to see if he was actually diabetic); hemoglobin A1c (blood test to check if he was diabetic); a complete metabolic (complete blood) and CBC (complete blood count), just to make sure he was doing okay; daily apply new dry dressings to his surgical wound; a wound culture and sensitivity test (the wound ultimately grew staph which was being treated by Bactrim that Dr. Toney previously prescribed); that the patient be helped with activities of daily life ("ADLs") such as dressing, etc., so he would not have to bend because of hip surgery; that a fasting blood sugar test be administered (another check to confirm or refute the diagnosis of diabetes); that the patient do total hip replacement exercises (post-op hip care), and ordered that the staff "'refer to sheets'" from the hospital on Mr. Bowman's hip precautions. (Toney Aff. ¶ 10; Medical Rec. 85.)

Trapeze bars and a toilet heightener were not immediately available at PMU, and there was no way Dr. Toney could make those items immediately available to Mr. Bowman. (Toney Aff. ¶ 11.) Dr. Toney is not responsible for ordering medical equipment for PMU. (*Id.*)

Nevertheless, Dr. Toney was informed by other staff members that, at or near the time of Mr. Bowman's admission to PMU, medical devices were ordered for Mr. Bowman, including trapeze bars to be placed over his bed and a toilet heightener. (*Id.*) Mr. Bowman was given what medical equipment PMU had available per his hip precautions, including a wedge for him to sleep up against to avoid putting weight on his hip in bed. (Toney Aff. ¶ 11; Medical Rec. 26–27.)   Additionally, Dr. Toney ordered that Mr. Bowman's hip precautions should be followed per the instruction sheets from the hospital and that Mr. Bowman be given assistance with ADL's while at PMU, so that Mr. Bowman would not have to bend his hip. (Toney Aff. ¶ 11; Medical Rec. 85.)

On October 30, 2007, Mr. Bowman called for a nurse from his bed at PMU at approximately 8:30 p.m., complaining that his hip came out of its socket. (Toney Aff. ¶ 12; Medical Rec. 26.) Dr. Toney was called and he ordered that Mr. Bowman be transported by ambulance to the hospital. (*Id.*) Mr. Bowman refused to give any information about his health history and refused an examination.  (*Id.*) An ambulance arrived at approximately 9:30 p.m. and transported Mr. Bowman to the Medical College of Virginia ("MCV") for treatment. (Toney Aff. ¶ 12; Medical Rec. 25, 26.) Mr. Bowman complained that his hip came out of its socket while he was lying in bed, not while he was in the shower or attempting to get out of bed. (Toney Aff. ¶ 18; Medical Rec. 26.)[11]

---

[11] According to Dr. Toney, the medical records suggest a number of possible alternative causes of Mr. Bowman's re-dislocation of his hip other than PMU not having trapeze bars or toilet heighteners for Mr. Bowman's use during his brief stay there. (Toney Aff. ¶ 19.) Mr. Bowman was, from the outset, at high risk for complications post-left hip surgery, especially given his morbid obesity. (*Id.*) Mr. Bowman's weight exerted increased pressure on the surgically repaired hip. (*Id.*) Additionally, there are numerous instances in the medical records where Mr. Bowman was noted to be mobile, using either a walker or a wheelchair. (Toney Aff. ¶ 19; Medical Rec. 24, 25, 27, 31.) Additionally, prior to Mr. Bowman coming to PMU, Mr.

On Saturday, November 3, 2007, Mr. Bowman returned to PMU from MCV.[12] (Toney Aff. ¶ 13; Medical Rec. 25.) Mr. Bowman's "Discharge Information Form" from MCV reflected, in pertinent part: "No weight bearing on left leg[ ] .... You are to have Dr. Schneider revise your left total hip next [M]onday." (Medical Rec. 43.)[13] On November 3, 2007, no distress was noted upon examination. (Toney Aff. ¶ 13; Medical Rec. 25.) Nevertheless, Mr. Bowman rated his left hip pain as a six out of ten on the pain scale and noted a constant ache. (*Id.*) Dr. Toney ordered that Mr. Bowman was not to bear weight on his left hip. (*Id.*)

According to Mr. Bowman, upon his return to PMU, Dr. Toney told the PMU staff not to help Mr. Bowman. (Bowman Decl. II ¶ 6.) Dr. Toney told Mr. Bowman that he already had dislocated his left hip and could not dislocate it again. (*Id.*) Dr. Toney also told Mr. Bowman that he could hop around on his own. (*Id.* ¶ 7.) Nevertheless, the record reflects that Mr. Bowman continued to receive medical care and assistance for the remainder of his stay at PMU.

---

Bowman dislocated his surgically repaired hip at another facility. (Toney Aff. ¶ 19; Medical Rec. 51.) This also increased the likelihood of the hip becoming dislocated again. (Toney Aff. ¶ 19.) The closed hip repair apparently did not fully succeed in preventing future dislocation. (*Id.*)

[12] Mr. Bowman's "Discharge Summary" from MCV reflects:

The patient was admitted to orthopedic surgery for attempt at closed reduction of his dislocated total hip arthroplasty. ... [W]e were unable to close reduce him. ... He was then awakened and transferred back to the security unit. His home medicines were restarted. ... We contacted Dr. Snyder about possible management of this patient ... and that he would need to revise him surgically, given the recurrent dislocations. We elected to proceed with nonsurgical options and transfer him to Dr. Snyder for surgical management, given his prior understanding of the hip arthroplasty that was in place and the possible tools that he may need to remove that hardware.

(Pl.'s Br. Opp'n Mot. Summ. J. (Dk. No. 88) Ex. G.)

[13] The following Monday was November 5, 2007.

Bowman fails to direct the Court to any specific instance where he requested assistance and the request was denied.[14]

On November 4, 2007, Mr. Bowman was noted to have been provided assistance with his ADLs and no distress was observed. (Toney Aff. ¶ 14; Medical Rec. 25.)

On November 5, 2007, it was noted that Mr. Bowman was resting in bed with his eyes closed and no distress was noted. (*Id.*) There is, however, no indication that Dr. Toney or anyone else attempted to coordinate Mr. Bowman's transport to the surgical appointment the staff at MCV had scheduled. Mr. Bowman also complained to Dr. Toney that the medical staff was following Dr. Toney's example and making fun of Mr. Bowman because of Mr. Bowman's weight. (Bowman Decl. II ¶ 10.) Mr. Bowman claims that Dr. Toney did not take any corrective action regarding the remarks. (*Id.*)

On November 6, 2007, around 4:00 p.m., Mr. Bowman was awake in bed with no complaints of pain, and receiving pain medications. (Toney Aff. ¶ 14; Medical Rec. 25.) However, a later entry in the medical records that day indicates that Mr. Bowman complained of discomfort and too much pressure on his hip, and was assisted in changing positions. (*Id.*) On November 6, 2007, the staples from the prior surgery were noted to have been removed. (Toney Aff. ¶ 14; Medical Rec. 76.) On November 6, 2007, Dr. Toney noted that Mr. Bowman had dislocated his left hip and required surgery by Dr. Snyder. (Toney Aff. ¶ 14; Medical Rec. 78.)

---

[14] According to Dr. Toney, he did not tell the nursing staff not to assist Mr. Bowman. (Toney Aff. ¶ 17.) To the contrary, Dr. Toney ordered that Mr. Bowman's hip precautions be followed at all times and that he be assisted with ADLs. (Toney Aff. ¶ 17; Medical Rec. 26–27, 85.)

Dr. Toney claims that he had no role in scheduling surgery for Mr. Bowman and never delayed transporting him for surgery. (Toney Aff. ¶ 16.) On November 6, 2007, the nursing staff spoke with Blue Ridge Orthopedics and confirmed that Mr. Bowman was scheduled for a hip replacement surgery at Fauquier Hospital on November 12, 2007, and noted that PMU would arrange for transportation. (Toney Aff. ¶ 16; Medical Rec. 78.)

On November 7, 2007, Mr. Bowman was noted to be quiet in bed throughout the night, then out of bed in a wheelchair in the morning. (Toney Aff. ¶ 14; Medical Rec. 25.) On that day, Mr. Bowman was able to transfer himself without difficulty and was able to move through the use of a wheelchair, without signs of discomfort. (*Id.*) The staff noted that they would assist and monitor Mr. Bowman as needed. (*Id.*) On November 7, 2007, Mr. Bowman also submitted a grievance wherein he complained that he was in pain and that the staff at MCV had refused to fix his hip because he was black. (Pl.'s Br. Opp'n Mot. Summ. J. Ex. MCV.)

On November 8, 2007, the staff at PMU observed Mr. Bowman lying in bed quietly with his eyes closed and then talking with his peers later in the day, with no distress noted and no complaints voiced. (Toney Aff. ¶ 15; Medical Rec. 24.) On November 9, 2007, Mr. Bowman refused a daily assessment. (*Id.*) He was sitting up at bedside in a wheelchair, and was assisted in making his bed. (*Id.*) On November 10, 2007, Mr. Bowman requested to be taken off his diabetic diet, requested medications for gas, and was given Aspirin and Mylanta. (*Id.*) He stated that he could not wait to go back to the hospital, and was selectively noncompliant and at times argumentative with staff. (*Id.*) On November 11, 2007, Mr. Bowman was noted to be in no acute distress. (*Id.*) On November 12, 2007, Mr. Bowman was observed to have been out of bed, going to the bathroom, and in no acute distress. (Toney Aff. ¶ 15; Medical Rec. 23.) On

November 12, 2007, Mr. Bowman was transported to Fauquier Hospital for surgery where he remained until he was apparently transferred to another facility. (*Id.*)

**B. Analysis**

Mr. Bowman contends that Dr. Toney violated his right to receive adequate medical care by failing to provide Mr. Bowman with the appropriate medical equipment and assistance that Mr. Bowman's prior physician had ordered (Claim 5(a)). Mr. Bowman further alleges that Dr. Toney failed to provide him with appropriate medical care after Mr. Bowman's hip dislocation and subsequent discharge from MCV back to PMU on November 3, 2007 (Claim 5(b)). "To establish that a health care provider's actions constitute deliberate indifference to a serious medical need, the treatment must be so grossly incompetent, inadequate, or excessive as to shock the conscience or to be intolerable to fundamental fairness." *Miltier v. Beorn,* 896 F.2d 848, 851 (4th Cir. 1990) (citing *Rogers v. Evans,* 792 F.2d 1052, 1058 (11th Cir. 1986)). This demanding test "requires a showing that the defendant[] . . . actually knew of and ignored a [prisoner's] serious need for medical care." *Young v. City of Mount Ranier,* 238 F.3d 567, 575–76 (4th Cir. 2001) (citing *White ex rel. White v. Chambliss,* 122 F.3d 731, 737 (4th Cir. 1997)).

This standard requires a plaintiff to introduce evidence from which the finder of fact could conclude that "the official in question subjectively recognized a substantial risk of harm" and "that the official in question subjectively recognized that his actions were 'inappropriate in light of that risk.'" *Parrish ex rel. Lee v. Cleveland,* 372 F.3d 294, 303 (4th Cir. 2004) (quoting *Rich v. Bruce,* 129 F.3d 336, 340 n.2 (4th Cir. 1997)). A plaintiff can meet his burden with respect to both elements "'in the usual ways, including inference from circumstantial evidence.'" *Id.* (quoting *Farmer v. Brennan,* 511 U.S. 825, 842 (1994)). Evidence that a defendant recklessly

refused or delayed in providing a plaintiff with access to medical professionals with sufficient expertise to evaluate and treat a particular condition may support an inference of deliberate indifference. *See Oxendine v. Kaplan*, 241 F.3d 1272, 1277–79 (10th Cir. 2001). Furthermore, absent exceptional circumstances, an inmate's disagreement with medical personnel with respect to a course of treatment is insufficient to state a cognizable constitutional claim, much less demonstrate deliberate indifference. *See Wright v. Collins,* 766 F.2d 841, 849 (4th Cir. 1985) (citing *Gittlemacker v. Prasse*, 428 F.2d 1, 6 (3d Cir. 1970)).

### 1. Alleged Failure to Provide Medical Equipment and Assistance

Mr. Bowman asserts that Dr. Toney violated his rights because the appropriate medical equipment was not available when Mr. Bowman arrived at PMU. Mr. Bowman asserts that "Dr. Ton[e]y had a duty to transfer Plaintiff once he was told by Plaintiff that PMU did not have medical equipment to prevent unnecessary pain and hip dislocation that Plaintiff's surgeon listed in Plaintiff's discharge summary." (Pl.'s Br. Opp'n Mot. Summ. J. 6.) Mr. Bowman's discharge summary indicates that Mr. Bowman required an "abduction wedge." (*Id.* Ex. 3.) The record reflects that Bowman was given such a wedge the day after his arrival at PMU. (Toney Aff. ¶ 8; Medical Rec. 27.)

In his complaint, Mr. Bowman asserts that he also needed a toilet seat heightener and a trapeze bar. (Compl. Claim 5 at 2.) Although these items were not immediately available upon Mr. Bowman's arrival at PMU, Dr. Toney attempted to acquire such items. *See Brown v. Harris*, 240 F.3d 383, 389–90 (4th Cir. 2001) (concluding a reasonable response on behalf of prison official defeats a claim of deliberate indifference). Even though Dr. Toney could not make those items immediately available to Mr. Bowman, the medical staff assured Dr. Toney that the items

24

were on order.[15]  (Toney Aff. ¶ 11.)  Additionally, Dr. Toney ordered that Mr. Bowman's hip precautions be followed per the instruction sheets from the hospital and that Mr. Bowman be given assistance with ADLs while at PMU.  (Toney Aff. ¶ 11; Medical Rec. 85.)  Mr. Bowman fails to provide any evidence of an instance where the medical staff refused to provide him with appropriate medical assistance at the behest of Dr. Toney.  Thus, Mr. Bowman has failed to demonstrate that Dr. Toney was deliberately indifferent to Mr. Bowman's need for appropriate medical equipment or assistance.

The record is less clear regarding what physical therapy, if any, Mr. Bowman received at PMU.  Mr. Bowman avers that he never received any physical therapy while at PMU.  (Bowman Decl. II ¶ 5.)  However, Mr. Bowman fails to direct the Court to evidence regarding what the therapy should have involved and whether it required the assistance of others.  According to Dr. Toney, he directed Mr. Bowman to do his "total hip replacement exercises (post-op hip care), and ordered that the staff 'refer to sheets' from the hospital on [Mr. Bowman's] hip precautions." (Toney Aff. ¶ 10 (quoting Medical Rec. 85).)  In any event, there is no competent evidence before the Court demonstrating that, while at PMU, the lack of physical therapy, medical assistance, or medical equipment resulted in any harm to Mr. Bowman.  *See Pearson v. Ramos,* 237 F.3d 881, 886 (7th Cir. 2001) (concluding inmate was incompetent to offer opinion as to causal connection between his lack of exercise and unhealthy gums).  Accordingly, Claim 5(a) will be dismissed.

_____

[15] Dr. Toney's testimony regarding what the medical staff had told him is admissible to show Dr. Toney's state of mind.  *See United States v. Leake,* 642 F.2d 715, 720 (4th Cir. 1981) (concluding that district court erred in excluding statement because "[a]lthough the testimony recounted the out-of-court statement of another, it was not hearsay because the statement was not offered to prove the truth of the matter asserted").

### 2. Alleged Failure to Provide Appropriate Medical Care After Mr. Bowman Was Returned to PMU on November 3, 2007

In Claim 5(b), Mr. Bowman insists that Dr. Toney provided him with inadequate medical care after he was returned to PMU on November 3, 2007, with his hip still dislocated. Specifically, Mr. Bowman claims that, "Dr. Toney refuse[d] to send Plaintiff back to MCV on [November 5, 2007] for a follow up to have Plaintiff's dislocated hip fixed." (Bowman Decl. II ¶ 8.) Although Mr. Bowman apparently was scheduled for an appointment at MCV on November 5, 2007, he did not make that appointment. However, there is no evidence that suggests that Dr. Toney hindered or prohibited Mr. Bowman from going to the November 5, 2007 appointment.[16] Dr. Toney swears that he had nothing to do with scheduling surgery for Mr. Bowman and never delayed transporting him for surgery. (Toney Aff. ¶ 16.) At best, the record suggests that, through some administrative oversight, MCV personnel and PMU personnel did not communicate and coordinate Mr. Bowman's November 5, 2007 appointment. By November 6, 2007, the nursing staff at PMU had scheduled Mr. Bowman for follow-up hip surgery with Fauquier Hospital on November 12, 2007. Mr. Bowman fails to direct the Court to evidence that once the November 5, 2007 appointment had passed, it was possible to schedule surgery with Dr. Snyder prior to November 12, 2007. *See Creech v. Nguyen*, No. 97-6925, 1998 WL 486354, at *7 (4th Cir. Aug. 7, 1998). Accordingly, Mr. Bowman fails to demonstrate that Dr. Toney acted with deliberate indifference to Mr. Bowman's need for follow-up surgery.

Although Mr. Bowman also generally alleges that Dr. Toney directed the medical staff not to assist Mr. Bowman upon his return to PMU on November 3, 2007, Mr. Bowman fails to

---

[16] Mr. Bowman's statement that Dr. Toney "refuse[d] to send Plaintiff back to MCV" does not appear to be based upon personal knowledge. *See* Fed. R. Civ. P. 56(c)(4).

direct the Court to admissible evidence of any single instance where he needed care and did not

receive it. Indeed, the record reflects that after Mr. Bowman was returned to PMU: staff

provided him with pain medication, assistance with his ADLs, assistance in adjusting his

position, assistance in making his bed, and provided with Mylanta when he complained of gas.

Drawing all reasonable inferences in Mr. Bowman's favor, he fails to demonstrate that Dr. Toney

violated his rights under the Eighth Amendment. Accordingly, Claim 5(b) will be dismissed.

Dr. Toney's motion for summary judgment will be granted.

An appropriate Order shall accompany this Memorandum Opinion.

It is SO ORDERED.

/s/

HENRY E. HUDSON
UNITED STATES DISTRICT JUDGE

Date: March 24 2011
Richmond, Virginia